BRITTON, Plaintiff in error, v. STATE, Defendant in error.
[Two appeals.]

*Nos. State 1, 2. Argued September 5, 1969.—Decided September 30, 1969.*
(Also reported in 170 N. W. 2d 785.)

For the plaintiff in error there was a brief by *Harry F. Peck, Jr.*, and *Hayes & Peck*, all of Milwaukee, and oral argument by *Harry F. Peck, Jr.*

For the defendant in error the cause was argued by *Terence T. Evans*, assistant district attorney of Milwaukee county, with whom on the brief were *Robert W. Warren*, attorney general, and *E. Michael McCann*, district attorney.

CONNOR T. HANSEN, J. The defendant raised four issues:

(1) The admissibility of confessions;

(2) The right of defendant, during postconviction proceedings, to inspect relevant portions of the state's files;

(3) Restriction of testimony during the trial; and

(4) Whether the interest of justice requires a reversal of defendant's conviction.

## I. *Admissibility of Confessions.*

Shortly after the shooting occurred, officer Larry Paul arrived on the scene and observed the victim lying on the sidewalk. A fourteen-year-old-boy, at the scene, told the officer the assailant had just run into a gangway be-

tween two nearby houses. The officer ran into the gangway and when he reached the rear saw a man coming out of a doorway. The officer asked him if he had been involved in the shooting that had just taken place out front. The man answered, "Yeh, I shot him." The defendant was then placed under arrest. The defendant's version of this incident is similar except as to the manner in which the officer was holding his gun. The defendant was then searched, a .22 revolver was removed from his pocket, and he was advised of his constitutional rights. The defendant argues the admission of the defendant's testimony of "Yeh, I shot him" prior to the admonition required in *Miranda v. Arizona* (1966), 384 U. S. 436, 86 Sup. Ct. 1602, 16 L. Ed. 2d 694, was such an error that now requires reversal.[1]

A pretrial *Goodchild*[2] hearing was conducted by the trial court which found the confession to be voluntary and not given while in custody. We concur with this determination by the trial court.

In this case, the officer was reacting naturally and spontaneously to the scene before him. He did not have any idea who shot Diaz and was merely attempting to sort out the facts. The record discloses the officer did not know the man coming out of the door, nor whether he was in any way involved in the shooting. The question, "Were you involved in the shooting?" was not asked in the setting or atmosphere with which *Miranda* was concerned but occurred prior to custodial interrogation. The officer had not proceeded beyond general on-the-scene questioning which is specifically exempted in *Miranda:*

"Our decision is not intended to hamper the traditional function of police officers in investigating crime. See *Escobedo v. Illinois.* . . . When an individual is in cus-

[1] In *State v. Miller* (1967), 35 Wis. 2d 454, 151 N. W. 2d 157, this court extensively considered the *Miranda* rule.

[2] *State ex rel. Goodchild v. Burke* (1965), 27 Wis. 2d 244, 133 N. W. 2d 753.

tody on probable cause, the police may, of course, seek out evidence in the field to be used at trial against him. Such investigation may include inquiry of persons not under restraint. *General on-the-scene questioning as to facts surrounding a crime* or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present." (Emphasis added.) *Miranda, supra,* pp. 477, 478.

"In announcing these principles, we are not unmindful of the burdens which law enforcement officials must bear, often under trying circumstances. We also fully recognize the obligation of all citizens to aid in enforcing the criminal laws. This Court, while protecting individual rights, has always given ample latitude to law enforcement agencies in the legitimate exercise of their duties. The limits we have placed on the interrogation process should not constitute an undue interference with a proper system of law enforcement. As we have noted, our decision does not *in any way* preclude police from carrying out their traditional investigatory functions." (Emphasis added.) *Miranda, supra,* p. 481.

Defendant's admission was not only given prior to custodial interrogation, but was also voluntary. Defendant's statement, "I shot him" was not in response to the officer's question, but completely voluntary; consistent with statements made after being advised of his constitutional rights; and consistent with the defense presented at the trial where the defendant testified that he had indeed shot Diaz. The record contains the following testimony elicited from the defendant on direct examination:

*"Q.* Now, you have sat through two days of trial here, and you are aware of course, that you are being tried on a charge of first degree murder, is that correct? *A.* Yes.
*"Q.* And that is for the shooting of Pedro Diaz? *A.* Yes.

"*Q.* Do you admit that you shot Pedro? *A.* Yes, I do but not intentionally to kill.

"*Q.* Now this was on October 2, 1966? *A.* That's right, yes.

"*Q.* And this occurred somewhere shortly after five p. m. on that date, is that correct? *A.* About five o'clock."

At the trial, defendant went into great detail in an attempt to explain why he shot Diaz. This testimony goes far to vitiate defendant's assertion that his statement to the officer shortly after the shooting was involuntary.

Because defendant's statement was both voluntary and not made in response to any custodial interrogation it was admissible.

*Admissibility of Written Confession.*

A confession, written by the defendant, was read into evidence by detective Thomas Bentz. The trial court found the defendant had voluntarily written the confession after being informed of his constitutional rights. The defendant argues that no confession was given until after the defendant had been taken to the hospital to identify the victim, who did not die until the following day. The defendant contends the totality of circumstances surrounding that visit rendered his confession involuntary due to psychological pressure, in a manner similar to a morgue visit. *Bradley v. State* (1967), 36 Wis. 2d 345, 153 N. W. 2d 38; *McKinley v. State* (1967), 37 Wis. 2d 26, 154 N. W. 2d 344.

The record discloses the defendant completed a written confession at 6:07 p. m. This confession was admitted into evidence. The defendant was taken to the hospital at 7:30 p. m. at which time a formal statement was taken

from the defendant by a stenographer. This statement was not offered as evidence.

While the record is silent as to any necessity for the hospital visit, we are of the opinion the situation presented in this case does not approach the psychological impact of a morgue viewing. Furthermore, the hospital visit has no relationship to the prior written confession given by the defendant.

## II. Failure to Disclose.

After the conviction, and pursuant to defendant's petition, this court appointed different counsel to represent defendant in any postconviction remedies. Subsequently, motions for a new trial and discovery were filed in the circuit court for Milwaukee county. On September 11, 1968, the motion for discovery was denied. On November 20, 1968, and again on December 2, 1968, this court refused to entertain a petition for writ of mandamus in regard to discovery. On January 2, 1969, the motion for a new trial, or, in the alternative, to set aside the verdict and find defendant not guilty, was denied by the circuit court. At that time the circuit court again denied defendant's discovery motion and refused to make an "in camera" inspection of the state's file or to seal that file and make it a part of the record so it could be considered on appeal.

On appeal, the defendant once again argues that during the postconviction proceedings he was entitled to inspect relevant portions of the state's file to determine if they contained information that the "defense might have made effective use of . . . at the trial or in obtaining further evidence." [3] It is further contended that fail-

---

[3] *Giles v. Maryland* (1967), 386 U. S. 66, 74, 87 Sup. Ct. 793, 17 L. Ed. 2d 737.

ure to disclose this information in postconviction proceedings constitutes a violation of due process.

We are not here confronted with an assertion that the state in any way suppressed any material evidence or in any way failed to correct any testimony it knew to be false. The only specific allegation of any material evidence suppressed by the state relates to the inability of one of the state's witnesses to speak English. However, the defendant does not specify the witness involved, nor how this would prejudice the defendant other than that an interpreter was required. The witness involved must be one Georgina Medina, a state's witness. She answered several questions in English. The prosecution then informed the court that it was of the opinion that this would be a proper situation for the use of an interpreter because the witness could only speak English to a limited degree. The examination of the witness then proceeded by use of an interpreter. Counsel representing the defendant during the trial did not object to the procedure, nor is there any indication that defense counsel was in fact unduly hampered by the use of an interpreter.

Defendant's postconviction request is to inspect relevant portions of the state's files to determine whether they contain any evidence in any way useful to the defendant. The defendant urges that *Brady v. Maryland* (1963), 373 U. S. 83, 83 Sup. Ct. 1194, 10 L. Ed. 2d 215, and *Giles v. Maryland, supra,* are authority which support his position. We are of the opinion that neither *Brady* nor *Giles* encompass the situation presented by the defendant on his appeal.

A distinction must be made between "disclosure" and "discovery." Discovery emphasizes the right of the defense to obtain access to evidence necessary to prepare its own case, while disclosure concerns itself with the duty of the prosecution to make available to the accused

the evidence and testimony which, as a minimum standard, is exculpatory based on constitutional standards of due process. Discovery has been left to rule-making power and has not been deemed a constitutional issue.[4] On the other hand, disclosure, or failure to disclose, is a constitutional issue to be decided on a case by case basis, and is the issue now before this court.

In *Brady v. Maryland, supra,* p. 87, it was held "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Giles* does not extend *Brady* as the defendant suggests but held the prosecution cannot allow false evidence to go uncorrected. While it is true the concurring opinion of Mr. Justice FORTAS in *Giles* would allow disclosure of all "helpful" information, a plurality of three members of the majority in *Giles* stated:

"Thus the case presents the broad questions whether the prosecution's constitutional duty to disclose extends to all evidence admissible and useful to the defense, and the degree of prejudice which must be shown to make necessary a new trial. *We find, however, that it is unnecessary and therefor inappropriate, to examine those questions.*" *Giles v. Maryland, supra,* pp. 73, 74. (Emphasis added.) For a full discussion of *Giles, see State v. Miller, supra.*

Therefore, while the defendant argues the constitution requires full disclosure of the helpful information, it is clear the United States Supreme Court has not yet extended disclosure, as a constitutional right, to the degree claimed by the defendant.

We determine that the trial court properly denied the motion of the defendant, during postconviction proceedings, to inspect relevant portions of the state's files to

---

[4] *State v. Miller, supra.*

determine whether they contained evidence in any way useful or helpful to him.

### III.  Restriction of Testimony.

The principal defense put forth during the trial was self-defense.  The record discloses that the defendant was six feet two inches tall and weighed 180 pounds and the deceased was five feet two inches tall and weighed 102 pounds.  On appeal, the defendant claims the trial court committed prejudicial error by unduly restricting testimony regarding prior acts of violence by the deceased. It is argued this restriction "surprised and frustrated" defense counsel so that he was no longer able to develop the testimony as originally intended.  However, the record is replete with defendant's testimony that he had witnessed the deceased attack other people.  In addition, a Mr. Eddie Kelly testified for the defense that the deceased was "mean" and liked to fight a lot.  Thus, defendant's contention that testimony as to prior acts of violence by the deceased was unduly restricted by the trial court must be rejected.

### IV.  New Trial in Interest of Justice.

" 'Occasionally when such grave doubts exist in our minds regarding the guilt of a defendant as to make us conscientiously believe that justice probably has miscarried, we exercise the authority specifically given to us by sec. 251.09, Stats., and reverse the judgment for a new trial.' "  State v. Fricke (1934), 215 Wis. 661, 667, 255 N. W. 724; quoted in State v. Herrington (1969), 41 Wis. 2d 757, 775, 165 N. W. 2d 120.

The evidence in support of the verdict is clearly sufficient and the record does not show any reason to believe that justice miscarried in this case.

By the Court.—Judgment and order affirmed.