DUMER, Plaintiff in error, v. STATE, Defendant in error.

*No. State 49. Submitted under sec. (Rule) 251.54 June 5, 1974.—*
*Decided June 28, 1974.—Opinion filed July 3, 1974.*
(Also reported in 219 N. W. 2d 592.)

The cause was submitted for the plaintiff in error on the briefs of *David L. Walther* and *Walther & Halling* of Milwaukee, and for the defendant in error on the brief of *Robert W. Warren,* attorney general, and *Robert D. Martinson* and *James H. McDermott,* assistant attorneys general.

HALLOWS, C. J.   According to the complainant's testimony, about 5:15 in the afternoon on August 2, 1972, the complainant witness was walking from 56th and Hampton Streets to her parents' home on North 65th Street in Milwaukee. When she was about one and a half blocks from her parents' house near the intersection of West 64th and West Luther Streets, Dumer came out between two houses and started to follow her. The complainant was a student at the University of Wisconsin-Milwaukee and at the time of the trial was twenty-six years old. Dumer was eighteen years old and a stranger to the complainant. Although the complainant witness walked fast, Dumer came aside of her and asked her where she was going and whether she would like company. He put his arm around her waist but he was repulsed. Thinking she might scare Dumer away, the complainant turned to a house hoping Dumer would think it was her parents' home. However, Dumer grabbed her and pulled her to the sidewalk leading around the side of the house to the backyard. Twice she screamed for help as loud as she

could but received a blow in the eye and a bloody nose by Dumer's closed fist and no help.

Dumer threatened her if she should scream again and then attempted to have intercourse in the backyard. She gave Dumer reasons why they should not have intercourse. She noticed two elderly people three houses away and pointed them out to Dumer. Dumer then pulled the complainant by the arm across the alley and into a clump of bushes where Dumer had intercourse although she made some attempts to prevent it. As soon as Dumer left, she ran into the alley and screamed that she had been raped.

A police officer testified that when he arrived at the scene, the complainant was visually upset, the right side of her face showed signs of swelling and redness. She had a bloody nose and her clothes and hair were disarrayed.

Dumer was arrested later that evening and admitted most of the facts detailed by the complainant through the point that he had bloodied her nose; the rest of the details Dumer claimed were voluntary on the complainant's part and that she willingly submitted to intercourse. While it may be true the complainant finally gave up resisting, the record does not impress us any more than the testimony did the jury that she willingly had intercourse but rather her will to resist was overcome by force.

## I. *Jurisdiction.*

The first claim made by Dumer is that the circuit court branch 18 for Milwaukee county wherein Dumer was tried had (1) no subject-matter jurisdiction, hence the judgment was void, and (2) the conviction is erroneous, hence the jurisdiction of the trial court was not properly invoked.

As to the first point, Dumer argues that the civil branch 18 of the circuit court, presided over by Circuit Judge CHRIST T. SERAPHIM, did not have criminal juris-

diction (the case was assigned to him for trial). Dumer was arraigned and entered a plea of not guilty in branch 12 of the circuit court, criminal division, for Milwaukee county presided over by Judge JOHN L. COFFEY. Dumer expressed a desire for a jury trial and a preference for a trial sometime in October of 1972. Judge COFFEY inquired whether Dumer objected to trying a case before Circuit Judge CHRIST T. SERAPHIM, which Dumer did. Judge COFFEY then indicated he might not be able to take the trial in October because he was to be calendar judge that month. He informed Dumer the trial might be transferred at the last minute if he were not able to get another judge to take the calendar. The trial date was postponed several times by Judge COFFEY, who finally set the date in January of 1973. However, in November Dumer requested an earlier trial date and the case was transferred to Judge SERAPHIM for trial. The transcript contained the following remarks by Judge COFFEY, "The court orders this case transferred to Judge SERAPHIM for trial." The judgment roll recites the court ordered the "case transferred to Hon. CHRIST T. SERAPHIM pursuant to Chapter 46, Laws of 1971, sec. 251.182,[1] with consent of Judge SERAPHIM. Case set for jury trial on

[1] "251.182 Assignment of judges. The chief justice of the supreme court or an associate justice designated by the supreme court shall keep informed of the status of the administration of judicial business in the courts of the state and may designate and assign active circuit and county judges and county judges qualified under s. 253. 195 to serve temporarily in either the circuit or county court and supreme court justices and circuit judges qualified under article VII, section 24 of the Wisconsin constitution to serve temporarily in circuit court.

"(1) The supreme court may promulgate rules necessary to accomplish the purposes of this section.

"(2) Active judges assigned to serve temporarily in another circuit or county court shall do so.

"(3) While acting temporarily in another circuit or county, a judge has the power to hold court, try cases and exercise all the authority of a judge of that court."

November 24, 1972, at 8:30 a. m. in Branch 18." Branch 18 of the circuit court was the last court created by the legislature and was designated a civil branch. At the time of the transfer, Judge SERAPHIM had been appointed by the chief justice under a general assignment to branches 11, 12 and 17 of the circuit court under sec. 251.182, Stats., commencing September 12, 1972, because of the "congested calendars in said branches of the court."

Circuit courts in Wisconsin have original jurisdiction of all matters civil and criminal not excepted in the constitution or not prohibited by law.[2] Dumer argues civil circuit courts in Milwaukee county do not have criminal jurisdiction because such courts were "prohibited by law" by secs. 252.015 (2) and 252.02, Stats. These two sections provide special treatment for Milwaukee county in the court system. In sec. 252.015 (2) [3] it is provided that in Milwaukee county "branches 11, 12 and 17 shall be designated as the criminal court branches." In order to deprive circuit courts of their criminal jurisdiction, the designation of branches 11, 12 and 17 would have to be exclusive. As we view this section, it is no more than an administrative designation to be sure that criminal cases

---

[2] Art. VII, sec. 8, of the Wisconsin Constitution provides:

"Circuit court, jurisdiction. SECTION 8. The circuit courts shall have original jurisdiction in all matters civil and criminal within this state, not excepted in this constitution, and not hereafter prohibited by law; and appellate jurisdiction from all inferior courts and tribunals, and a supervisory control over the same. They shall also have the power to issue writs of habeas corpus, mandamus, injunction, quo warranto, certiorari, and all other writs necessary to carry into effect their orders, judgments and decrees, and give them a general control over inferior courts and jurisdictions."

[3] "252.015 Multibranch circuit courts. . . .

"(2) Each such branch constitutes a circuit court with all the powers and jurisdiction possessed by circuit courts in circuits having one judge only, and may be designated in all papers and proceedings either by its respective number or by the name of its presiding judge, except that in the 2nd circuit, branches 11, 12 and 17 shall be designated as the criminal court branches."

are assigned to the designated criminal branches. Neither does sec. 252.02 [4] contain any prohibition or limiting of circuit courts' criminal jurisdiction. This section is somewhat ambiguous in its reference to "all cases specified in s. 252.015 for the 2nd circuit criminal branch jurisdiction" because sec. 252.015 does not designate cases but merely provides that branches 11, 12 and 17 shall be designated as the criminal branches. In sec. 252.02 it is also provided that the clerk shall assign all the cases specified in sec. 252.015 to the criminal branches and shall be reassigned out in case of disqualification, illness or vacation of the judges or vacancies in branches 11, 12 and 17. We read sec. 252.02 to empower the clerk as an administrative duty to assign cases to the criminal branch and reassign cases in the specified situations. This does not limit the jurisdiction of the civil branches of the circuit court. The statute is also ambiguous in its

---

[4] "252.02 Administration of work in multibranch courts; grand jury. In circuits in which there are 2 or more branches, the judges may provide for the distribution of the work and assignment of cases among branches except that in the 2nd circuit, branches 11, 12 and 17 shall be designated as the criminal court branches and all cases specified in s. 252.015 for the 2nd circuit criminal branch jurisdiction including all appeals from convictions in criminal actions and from ordinances and traffic forfeiture violations from the county court of Milwaukee county, and all commitments and transfers for trial in case of crimes and misdemeanors not triable in the county court branches shall be assigned by the clerk to those branches and shall be reassigned to another branch only in case of disqualification, illness or vacation of the judges or congestion or vacancies in branches 11, 12 and 17. The judges of the 2nd circuit criminal court branches shall allocate the work of said branches. All assignments of work to said branches by the clerk shall be subject to the approval of said judges. No grand jury shall hereafter be drawn or summoned for the circuit court of Milwaukee county unless a judge of one of the criminal court branches makes and files with the clerk an order in writing directing a grand jury to be summoned, and specifying the time at which such grand jury shall appear before the court."

statements that all assignment of work to "said branches" by the clerk shall be subject to the "approval of said judges." This means, and apparently Judge COFFEY thought so, that a judge of a civil branch to which cases are assigned must approve the assignment, otherwise, a, civil court branch's work could be controlled by the criminal branch. However, such consent is not jurisdictional and a reassignment for purposes stated does not confer subject-matter jurisdiction on the civil circuit branch but merely invokes the subject-matter jurisdiction. We doubt whether the words of the statute, "the consent of said judges must be had," means all the judges of the circuit court whose approval could be evidenced by rules of court adopted by them.

The administration of the courts in Milwaukee county is governed by the statutes, supreme court rules, and local rules. The judges of the circuit court for Milwaukee county have rules governing the transfer and reassignment of criminal cases, which are subject to other provisions of the statutes and the supreme court rules. The supreme court has promulgated rules [5] which were filed December 23, 1971, and amended June 6, 1973.

---

[5] "August Term, 1971
"STATE OF WISCONSIN — IN SUPREME COURT

---

"In re ASSIGNMENT OF TRIAL JUDGES.

---

"In the exercise of its inherent superintending power and also pursuant to Chapter 46, Laws of 1971, amending sec. 251.182, Stats., this court, to establish state-wide uniformity in the assignment of judges with flexibility in the metropolitan areas and to accomplish the purposes of said section, adopts and promulgates the following rules:

"I. All assignments of judges, active or reserve, to serve temporarily in any court or branch thereof shall be made by the chief justice for such purposes and period as he may determine to be necessary except as otherwise provided herein.

"II. In counties having a chairman of the county board of judges, an active judge who is going to be absent from his court

The local rule (rules have been promulgated by the judges of the circuit court for Milwaukee county. *See* 2 Milwau-

shall notify the chairman of the board thereof and the chairman of the board may assign under the supervision of the chief justice and active judge of such county to substitute for the absenting judge for a period not exceeding seven consecutive-calendar days. In such counties the chairman of such board of judges may also assign under the supervision of the chief justice an active judge of such county to relieve congestion, to expedite disposition of litigation, or to assist in any branch of the circuit or county court of such county for a period not exceeding seven consecutive-calendar days. The chairman of the board shall make an order accordingly and immediately send a copy of such order to the administrative director of courts. If no active judge of the county is available for such service, the chairman of the board shall refer the matter to the administrative director of courts, requesting the appointment of an outside or a reserve judge by the chief justice.

"III. In counties not having a chairman of the county board of judges, an active judge under the supervision of the chief justice may appoint another active judge to sit in his stead when he is absent if the appointed judge is agreeable, for a period not exceeding seven consecutive-calendar days. In such counties an active judge may also assign under the supervision of the chief justice an active judge of such county to relieve congestion or to expedite disposition of litigation. The appointing judge shall make an order providing for the substitution and shall immediately send a copy thereof to the administrative director of courts on a form furnished by him.

"IV. When a judge is going to be absent over seven consecutive-calendar days or desires the chief justice to appoint a judge for a period less than seven days, he shall give reasonable prior notice to the administrative director of courts.

"V. In cases of disqualification, whether because of a request for substitution, other mandatory disqualification, or a self-disqualification, the judge shall cause the clerk of courts of his county to promptly notify the administrative director of courts; another judge shall be promptly assigned to preside in such a case by the chief justice. However, in a county in which there are three or more branches of either the circuit court or the county court, the assignment of judges in such cases shall be by lot under a tab system for such circuit or county court which has

kee Code of Ordinances, Appendix, Rules of Civil and
Criminal Practice of the Circuit Court for Milwaukee

three or more judges. Such tab system shall be approved by the
chief justice and supervised by the administrative director of
courts.

"VI. In Milwaukee County there shall be a tab system for
each division of the courts operated by the clerk of court as
follows:

"(a) Each separate tab system for the criminal division; civil
division, and domestic relations section of the family-court division
of the circuit court; and the civil division of the county court
shall include only the judges working regularly in that section
or division and those assigned to that section or division for a
period of four months or more.

"(b) The tab system in the misdemeanor and traffic division
(Branches 3, 4, and 12) of the county court shall include only
the judges working regularly in that division and those assigned
to that division for a period of two months or more.

"(c) The probate division and the children's division of the
county court shall have no tab system. The assignments will be
made by the chief justice; the judges thereof shall cause the
register in probate or the clerk of courts, as the case may be,
to immediately notify the administrative director of courts of the
need for such assignment.

"(d) In cases of disqualification where an outside judge is
indicated, the assignment will be made by the chief justice and
the disqualifying judge shall cause the clerk of the court or the
register in probate, as the case may be, to notify the administrative
director of courts of the need of such assignment.

"VII. Whenever a judge is appointed by the chief justice or
a chairman of the county board of judges under these rules to
serve in any court or branch thereof or to hear a case, he shall
do so and shall have all the authority necessary for that purpose.
Whenever the term 'chief justice' is used, it includes an associate
justice designated by the supreme court for that purpose and it
includes the administrative director of courts when acting within
his authorization as the agent of the chief justice or of such
designated associate justice. Whenever the term 'chairman of
the county board of judges' is used, it includes 'chief judge.'
'Chairman of the county board of judges' shall mean of a county
board of judges created under sec. 256.59, Stats. The adminis-

600

County, as amended to March 1, 1972), civil and criminal court branches, Rule 3–E,[6] provides the reassignment of which is basically controlled by sec. 252.017, but this seems to apply to the family court. Rule 3–B,[7] procedure for reassignment, provides in sub. (1) the chief judge shall reassign the case by lot in the manner as cases are

trative director of courts shall furnish forms to all trial judges for the assignment of judges.

"VIII. These rules for the assignment of judges are not to be confused with or do they apply to the transfer of cases from one branch of a court to another branch or from one judge in a given branch of court to another judge in a given branch of court by a judge or a chairman of the county board of judges for the purpose of:

"(a) consolidation for trial;

"(b) merger;

"(c) to be handled by a judge handling similar cases;

"(d) to relieve congestion;

"(e) to equalize caseloads of judges;

"(f) for convenience.

"IX. These rules shall be reviewed after the expiration of six months."

[6] 2 Milwaukee Code of Ordinances, Appendix, Rules of Civil and Criminal Practice of the circuit court for Milwaukee County (as amended to March 1, 1972):

Rule 3–E. "Criminal Court Branches. Transfer or re-assignment of criminal court branch cases and proceedings shall be controlled by sec. 252.017, Wis. Stats.; and when transferred to the civil court branch, the assignment to a judge is to be as provided by these rules. (Created 10–18–61)"

[7] Rule 3–B. "Procedure for Re-assignment.

"(1) If the case is to be transferred to another judge by reason other than an affidavit of prejudice, or consolidation of cases for trial, or otherwise, said Chief Judge shall forthwith cause the case to be re-assigned by lot in the same manner as cases are originally assigned, unless other procedure therefor is provided by law.

"(2) If a judge be relieved of the trial of a case by reason of disqualification or consolidation of cases under Rule 3D, said Chief Judge shall assign to him a case from the calendar of the judge who becomes obligated to try the case so transferred or consolidated. (Amended 1–12–70)"

originally assigned. Rule 4,[8] temporary absence of assigned judge, provides that in the absence of the trial judge because of illness or other reason the cases may be heard temporarily by any judge excepting that in a criminal branch such case is to be controlled by sec. 252.017, Stats. This latter exception refers to the family court and is apparently a mistake.

It is contended by Dumer that the procedure in the rules set up by the circuit judges was ignored in the instant case and an attempt was made to make branch 18 a criminal court branch contrary to the statute. It appears from the record that Judge COFFEY had no power or authority as a calendar judge to transfer the case to Judge SERAPHIM as judge of civil branch 18. However, we think that Judge COFFEY when he has the calendar and is also trying cases so that he cannot hear cases scheduled for trial, which amounts to a congestion in his court, he has power to transfer cases to judges assigned to the criminal branches by the chief justice, and Judge SERAPHIM was so assigned by the chief justice. When a case is to be reassigned to a civil branch, it should be sent to the chief judge for a reassignment by lot. However, the lottery system except for disqualification and other specific reason is not applicable to reassignment of cases within the criminal branch.

Dumer argues as his second point that his judgment of conviction was at least erroneous because the jurisdiction of the court was not properly invoked, citing various cases. *Application of Clark* (1908), 135 Wis. 437, 115

---

[8] Rule 4. "**Temporary Absence of Assigned Judge.** The cases on the calendar of a judge who is temporarily absent because of illness or for other reason may be heard temporarily by any judge whom the absent judge or . . . [which] the said Chief Judge may request to hear them; except that those in the criminal court branch shall be controlled by sec. 252.017, Wis. Stats. (Amended 2–15–61 and 1–12–70)"

N. W. 387; *State v. Fischer* (1921), 175 Wis. 69, 184 N. W. 774; *Seyfert v. Seyfert* (1930), 201 Wis. 223, 229 N. W. 636; *State ex rel. Hammer v. Williams* (1932), 209 Wis. 541, 245 N. W. 663; *Galloway v. State* (1966), 32 Wis. 2d 414, 420, 145 N. W. 2d 761, 147 N. W. 2d 542; *State v. Wimberly* (1972), 55 Wis. 2d 437, 198 N. W. 2d 360.

The record and assignment of this case shows that it was assigned pursuant to sec. 251.182, Stats. The chief justice had assigned Judge SERAPHIM to the criminal branch. The authority given Judge CHRIST T. SERAPHIM to hear the case was as a judge of criminal branches 11, 12 and 17; and when he heard this case he was not sitting as a judge of civil branch 18. Dumer's argument would apply if the case had been assigned to civil branch 18; it has no merit applied to branches 11, 12 and 17, because Judge SERAPHIM was sitting in the branch to which the case had originally been assigned by the clerk of court under sec. 252.02. In view of the judgment roll and giving Judge COFFEY credit for making the assignment to a judge empowered by the chief justice to hear the case in a criminal branch, we must conclude that it was an erroneous note added by the clerk that the case was transferred to branch 18 instead of noting the assignment of the case to Judge SERAPHIM as an additional judge to branch 12 which seems to be the branch the case was assigned to by him.[9]

## II. *Suppression of evidence.*

Dumer complains the prosecution willfully suppressed exculpatory evidence known to it and thus denied him his right to due process of law. This argument is based on the fact that after the jury had found Dumer guilty, counsel for Dumer asked for a stay of commitment so he

---

[9] The Milwaukee county present procedure is set forth in *Baldwin v. State* (1974), 62 Wis. 2d 521, 215 N. W. 2d 541.

might move for a new trial on the ground of newly discovered evidence. He stated to the court that after the trial a man came up to him and asked him what he should do with a subpoena to testify on behalf of the state. Defense counsel asked the subpoenaed witness what he saw and the witness replied, "I saw it from the sidewalk to the back." The court interrupted and stated the evidence was not newly discovered because the witnesses for the prosecution had been made available to him. Defense counsel admitted the witnesses were available but stated he had not spoken to them.

There are several things wrong with Dumer's argument aside from the fact the evidence is not newly discovered; the motion was not made in writing or supported by affidavits or a request made for an evidentiary hearing. In *State v. Herfel* (1971), 49 Wis. 2d 513, 521, 522, 182 N. W. 2d 232, this court reiterated the standard requirements for granting a new trial on the basis of newly discovered evidence. They are: (1) The evidence must have come to the moving party's knowledge after a trial; (2) the moving party must not have been negligent in seeking to discover it; (3) the evidence must be material to the issue; (4) the testimony must not be merely cumulative to the testimony which was introduced at trial; and (5) it must be reasonably probable that a different result would be reached on a new trial. *Estate of Eannelli* (1955), 269 Wis. 192, 68 N. W. 2d 791; *see Lock v. State* (1966), 31 Wis. 2d 110, 118, 142 N. W. 2d 183; and *also State v. Simmons* (1973), 57 Wis. 2d 285, 203 N. W. 2d 887; *State v. Van Ark* (1974), 62 Wis. 2d 155, 215 N. W. 2d 41.

In *Simmons*, this court discussed the obligations attendant upon the defendant in presenting his motion. *Id.* at pages 290, 291:

". . . The moving party in a motion for new trial has the obligation to raise the issues which trigger the court's discretion. . . .

". . . One moving for a new trial has the obligation to include in his motion allegations, prima facie at least, to show reasons for a new trial. It is not sufficient to make assertions of a general nature. Moreover, where the allegations made can only be supported by the submission of additional evidence, an evidentiary showing must be made either by affidavit or by oral testimony."

From the record we receive the impression that trial counsel (who is not counsel on this appeal) had poorly prepared his case. This evidence, whatever it might be, could have been discovered prior to trial. Defense counsel had an opportunity to question the prosecution witnesses and did not. An attorney cannot poorly prepare a case and then hope to bail himself out on the doctrine of newly discovered evidence; the doctrine is for the diligent. Dumer offered no excuse or reason for his failure to question these prospective witnesses before trial. The argument is also defective in that there is no showing that it is reasonably probable that a different result would have been reached on a new trial. As was pointed out by the trial court, what this witness is purported to have seen occurred after the threats were made to the prosecution witness and after Dumer had hit her to the point where she allegedly submitted. This court has several times said a state has no obligation to produce at trial every possible witness to the commission of an alleged crime. *Dillon v. State* (1909), 137 Wis. 655, 119 N. W. 352; *Brown v. State* (1965), 28 Wis. 2d 383, 137 N. W. 2d 53; *State v. Chacon* (1971), 50 Wis. 2d 73, 183 N. W. 2d 84. Moreover, the record does not show the prosecution knew that the testimony of the witness would be exculpatory.

Whether evidence is newly discovered or not, if the evidence is exculpatory the defendant had a duty to make a request to the prosecution for such evidence before or during trial. Dumer failed to make such request or a motion before trial and failed to move before trial in accordance with sec. 971.23 (3), Stats., for a list of wit-

nesses whom the prosecution intended to call at trial.[10] In *Brady v. Maryland* (1963), 373 U. S. 83, 87, 83 Sup. Ct. 1194, 10 L. Ed. 2d 215, the United States Supreme Court held "the suppression by the prosecution of evidence favorable to an accused *upon request* violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (Emphasis supplied.) In *Giles v. Maryland* (1967), 386 U. S. 66, 74, 87 Sup. Ct. 793, 17 L. Ed. 2d 737, that court held the prosecution may not allow *false evidence* to go uncorrected. This court has adopted the principles therein announced. In *State v. Miller* (1967), 35 Wis. 2d 454, 474–478, 151 N. W. 2d 157, we held *Brady* and *Giles* stated the rule that offered perjured testimony detrimental to the accused or suppressed testimony favorable or beneficial to him after a request therefore constitutes a lack of due process under the fourteenth amendment. In *Ramer v. State* (1968), 40 Wis. 2d 79, 86–88, 161 N. W. 2d 209, this court interpreted *Giles* to require only that the prosecution not allow false evidence to go uncorrected, albeit the truth may be relevant only to the credibility of a witness. In *Britton v. State* (1969), 44 Wis. 2d 109, 116–118, 170 N. W. 2d 785, we refused to extend the prosecution's constitutional duty

---

[10] In *Irby v. State* (1973), 60 Wis. 2d 311, 319, 320, 210 N. W. 2d 755, this court interpreted sec. 971.23 (3) (a), Stats., to allow a pretrial discovery by the defendant of the list of witnesses the prosecution intended to call at trial, not a list of all witnesses known by the prosecution to have information which may be relevant to the charge or the defense as allowed under Fla. Cr. P. R. 1.220 (e). A distinction must be observed between "disclosure" and "discovery." As this court said in *Britton v. State* (1969), 44 Wis. 2d 109, 117, 118, 170 N. W. 2d 785, "[d]iscovery emphasizes the right of the defense to obtain access to evidence necessary to prepare its own case, while disclosure concerns itself with the duty of the prosecution to make available to the accused the evidence and testimony which, as a minimum standard, is exculpatory based on constitutional standards of due process."

to disclose to all evidence admissible and useful to the defense; likewise in *Goetsch v. State* (1969), 45 Wis. 2d 285, 292, 172 N. W. 2d 688, we held the prosecution's failure to offer the defendant the tests administered by the department of health and social services to him for the purpose of facilitating his cross-examination of state witnesses at a *Huebner* [11] hearing testing his need for specialized treatment under the sex crimes program was not error in the absence of a request therefor because "[t]he constitution imposes no duty upon the state to produce *unrequested* documents." (Emphasis supplied.) *State v. Chacon* (1971), 50 Wis. 2d 73, 76, 77, 183 N. W. 2d 84, held the state is not required to conduct a discovery examination for the defendant. In *State v. Cole* (1971), 50 Wis. 2d 449, 455–457, 184 N. W. 2d 75, the defendant's claim that the state had failed to disclose exculpatory evidence known to it did not amount to a *Brady* violation of due process for the reasons the defendant had never requested disclosure of same nor was the evidence exculpatory in fact, nor was the evidence in the exclusive possession of the state. In *Simos v. State* (1972), 53 Wis. 2d 493, 496–498, 192 N. W. 2d 877, this court read *Brady v. Maryland, State v. Cole,* and *Goetsch v. State* to require a defense demand for the exculpatory evidence as a precondition to claiming a violation of due process for suppression of same; and in *Mikulovsky v. State* (1972), 54 Wis. 2d 699, 722, 196 N. W. 2d 748, this court reiterated the necessity for a defense demand for exculpatory evidence.

Recently, in *Nelson v. State* (1973), 59 Wis. 2d 474, 208 N. W. 2d 410, this court undertook a substantial review of the entire subject of claimed prosecutorial suppression of exculpatory evidence and stated that "[w]hile the duty of the state to disclose exculpatory evidence has not been constitutionally extended to require full disclosure of all evidence helpful to the accused, there is

---

[11] *Huebner v. State* (1967), 33 Wis. 2d 505, 147 N. W. 2d 646.

precedent for the proposition that evidence, material on the issue of accused's guilt or innocence, should be disclosed to the accused even though it goes only to the credibility of a witness," [12] *id.* page 481. However, this court interpreted the recent United States Supreme Court case of *Moore v. Illinois* (1972), 408 U. S. 786, 92 Sup. Ct. 2562, 33 L. Ed. 2d 706, as having reaffirmed the necessity of a request by the defense for the claimed exculpatory evidence as a prerequisite for claiming prosecutorial suppression of exculpatory evidence and reaffirmed *State v. Cole* holding that a defense demand for claimed exculpatory evidence is indispensable. The court specifically rejected those cases [13] holding a specific request is not in all cases an indispensable prerequisite. Dumer may not claim prosecutorial suppression of alleged exculpatory evidence because he made no request therefore.

### III. *Sufficiency of evidence.*

Dumer argues there is not sufficient credible evidence to sustain his conviction for rape under sec. 944.01, Stats.[14] Rape is committed by force and against a per-

---

[12] *Giglio v. United States* (1972), 405 U. S. 150, 154, 92 Sup. Ct. 763, 31 L. Ed. 2d 104; *United States v. Hibler* (9th Cir. 1972), 463 Fed. 2d 455, 460; *Loraine v. United States* (9th Cir. 1968), 396 Fed. 2d 335, 339, certiorari denied, 393 U. S. 933, 89 Sup. Ct. 292, 21 L. Ed. 2d 270; and *Simos v. Gray* (E. D. Wis. 1973), 356 Fed. Supp. 265; among others.

[13] *See: United States v. Wilkins* (2d Cir. 1964), 326 Fed. 2d 135; *United States v. Baldi* (3d Cir. 1952), 195 Fed. 2d 815, certiorari denied, 345 U. S. 904, 73 Sup. Ct. 639, 97 L. Ed. 1341; *Barbee v. Warden, Maryland Penitentiary* (4th Cir. 1964), 331 Fed. 2d 842; *Clarke v. Burke* (7th Cir. 1971), 440 Fed. 2d 853; *United States v. Poole* (7th Cir. 1967), 379 Fed. 2d 645; *Lee v. United States* (9th Cir. 1968), 388 Fed. 2d 737; *United States v. Wolfson* (D. C. Del. 1971), 322 Fed. Supp. 798.

[14] "(1) Any male who has sexual intercourse with a female he knows is not his wife, by force and against her will, may be imprisoned not more than 30 years.

son's will. This may be accomplished by overcoming the woman's utmost resistance or overcoming her will to resist.

"Utmost resistance" has been termed a relative concept rather than an absolute concept by this court. *State v. Schmear* (1965), 28 Wis. 2d 126, 135 N. W. 2d 842; *State v. Waters* (1965), 28 Wis. 2d 148, 135 N. W. 2d 768; *Gray v. State* (1968), 40 Wis. 2d 379, 161 N. W. 2d 892; *State v. Clarke* (1967), 36 Wis. 2d 263, 153 N. W. 2d 61, certiorari denied, 393 U. S. 861, 89 Sup. Ct. 140, 21 L. Ed. 2d 129; *State v. Herfel* (1971), 49 Wis. 2d 513, 182 N. W. 2d 232; *Baldwin v. State* (1973), 59 Wis. 2d 116, 207 N. W. 2d 630. The governing principles in respect to "utmost resistance" were set out in *McLain v. State* (1914), 159 Wis. 204, 206, 149 N. W. 771:

"It must be remembered that the term 'utmost resistance' is a relative rather than a positive term. What would be 'utmost resistance' on the part of a weak and nervous person, with a temperament easily frightened, might be the veriest sham on the part of a robust person in good health, whose nerves and courage are normal."

In *State v. Schmear* (1965), 28 Wis. 2d 126, 130, 135 N. W. 2d 842, we stated that "While the law requires the utmost resistance as evidence of the woman's will, the law does not require the useless or the impossible." And in *State v. Waters* (1965), 28 Wis. 2d 148, 155, 135 N. W. 2d 768, we stated, "The strict physical-resistance requirement is relaxed somewhat if it would be useless to resist." *See also Baldwin v. State, supra,* pages 124, 125.

We think the instant case is not one of overcoming utmost physical resistance by force but rather overcoming the complaining witness' will by force. This alternative

"(2) In this section, the phrase 'by force and against her will' means either that her utmost resistance is overcome or prevented by physical violence or that her will to resist is overcome by threats of imminent physical violence likely to cause great bodily harm."

requirement of sec. 944.01, Stats., that it be shown that the complainant's will to resist was overcome by threats of imminent physical violence likely to cause great bodily harm was explained in *State v. Hoffman* (1938), 228 Wis. 235, 280 N. W. 357, as the law stood at that time:

"It therefore clearly appears that 'the fear' which renders the utmost resistance unnecessary is a 'fear of death or great bodily harm,' a 'fear of great personal injury,' or 'serious personal injury,' a fear that 'so over-powers her that she dares not resist,' a 'fear and terror so extreme as to preclude resistance,' a fear which renders her mind 'well nigh incapable of continuing her resistance to repel him.' The fear therefore must not only be real but so great as to terrify her and render her practically incapable of resistance."

In *State v. Herfel, supra,* we rejected this rule and said:

"The test of whether a woman's will to resist is over-come by threats of imminent physical violence likely to cause great bodily harm is subjective and it need not be expressed in terms of fear and incapability to resist in every case. Some women may respond to the threat of gunpoint without great fear or being rendered incapable of resisting. Resistance may be completely and imminent-ly dangerous. In such a situation, fear or terror not to resist as an expression of nonconsent may be supplanted by a strong motivation or belief which induces the choice to submit. The choice under such conditions, while philo-sophically a choice, is legally unfair and is legally no choice; it does not constitute legal consent. Resistance, or the lack of resistance . . . is not the central issue in rape. It is only some evidence of whether the woman's will to resist is overcome under the circumstances and this question depends upon other factors."

In *Baldwin v. State, supra,* page 125, this court reiter-ated that, "A rational choice not to resist coerced through threats of violence and fear is not a legal choice and the decision to submit compelled by such threats, although rationally made, does not constitute a voluntary submis-

sion. To say that there can be a coerced voluntary submission is patently contradictory." The threats of death or serious bodily injury to the complainant need not be made in any particular manner to enable this court to conclude it was reasonable for the jury to have believed and found the complainant had been put in fear of her life or serious bodily injury so as to overcome her will to resist. Dumer argues the test should be objective and not subjective; we think not. The complainant had sought to summon help by screaming twice. Her efforts were to no avail. She was struck by Dumer and threatened with more violence if she tried to scream again. She began to bleed from the nose, and her right eye began to swell shut. She lost feeling in the right side of her face. This assumes significance in the light of her claim that she became very frightened because she had never been struck before. She was threatened by Dumer with the forcible removal of her clothing if she did not undress herself. The probability of imminent physical violence likely to cause great bodily harm was real. On the theory her will was overcome, it is difficult to conceive how a woman in her early 20's would consent to intercourse with a stranger behind bushes of an alley in broad daylight. We think the evidence was sufficient to sustain the verdict.

Dumer obtained a writ of error from his oral motion for a new trial. The state argues an oral pronouncement denying such a motion does not amount to an appealable order. Sec. 270.70, Stats., provides that "the filing of the judgment or order in either the circuit or county court in the office of the clerk constitutes the entry of the judgment or order." In sec. 274.10 it is provided that any order defined in sec. 274.33 may be reviewed by the supreme court upon an appeal, and sec. 274.33 refers to appealable orders as those "made by the court," listing them. However, an order is defined in sec. 270.53 (2) as "every direction of a court or judge made or entered in writing and not included in a judgment is denominated

an order." While there was an oral order made for some purpose, it was not entered for appeal purposes. In *State ex rel. Hildebrand v. Kegu* (1973), 59 Wis. 2d 215, 216, 207 N. W. 2d 658, this court stated it had no jurisdiction to review an oral order dismissing a complaint in a paternity case, relying on *Alsmeyer v. Norden* (1961), 14 Wis. 2d 451, 111 N. W. 2d 507. The court pointed out that while an oral order may be effective although it has not been reduced to writing it was necessary to reduce the order to writing although an administrative act to preserve the evidence of the order which was necessary to confer appellate jurisdiction and to comply with the entry requirement of an order under sec. 274.11 (4). Although the order may appear in the transcript and be filed with the clerk of courts, such is not an entry of the writing of the order within the meaning of sec. 270.53 (2). Here, there was an oral order and no written order was ever entered denying a new trial. It is true, in *State v. Wollmer* (1970), 46 Wis. 2d 334, 174 N. W. 2d 491, and *Babbitt v. State* (1964), 23 Wis. 2d 446, 127 N. W. 2d 405, we held a conviction entry in the judgment roll amounts to "entry," for purposes of former sec. 958.13, the predecessor of present sec. 974.03 and the judgment roll in the instant case shows that a motion had been denied, we do not think a notation in the judgment roll is sufficient entry of a motion for a new trial. Convictions by the court either upon a jury verdict or upon its own finding of guilty are in a different category than ordinary motions for a new trial. On this basis, the writ of error from the alleged order should be dismissed.

*By the Court.*—Judgment affirmed; writ of error from order dismissed.